## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| KAITLYN WHETSTONE | § | |
| | § | |
| VS. | § | C.A. NO. _____ |
| | § | |
| GENERAL MOTORS, LLC | § | JURY TRIAL DEMANDED |

## PLAINTIFFS' ORIGINAL COMPLAINT

Plaintiffs, KAITLYN WHETSTONE (hereinafter referred to as "Plaintiff", "Plaintiffs", and/or "WHETSTONE"), brings this action against GENERAL MOTORS LLC; and/or its related subsidiaries, successors, or affiliates ("GM").

## **INTRODUCTION**

1.      These claims arise out of motor vehicle accidents, wherein the airbags failed to deploy, resulting in Plaintiffs sustaining significant and long-lasting injuries that continue to this day.  This case also involves serious and permanent personal injuries that were suffered by the Plaintiffs as the result of an egregious and unprecedented failure to disclose and actively conceal a known defect in GM vehicles.

2.      Prior to the accidents referenced in the paragraphs above, Defendant General Motors, LLC ("New GM" or "Defendant") knew that Plaintiffs' vehicles were defective, yet failed to adequately disclose the defect or warn users of its existence. Rather, Defendant negligently, intentionally, purposely, fraudulently, and systematically concealed the defect from Plaintiffs, the federal government and the public at large.

3.      An auto manufacturer should never make profits more important than safety and should never conceal defects that exist in its vehicles from consumers or the public. GM's Vehicle Safety Chief, Jeff Boyer has stated that: "Nothing is more important

than the safety of our customers in the vehicles they drive." Yet GM failed to live up to this commitment.

4.      The first priority of a car manufacturer should be to ensure that its vehicles are safe, and particularly that its vehicles have operable ignition systems, airbags, power-steering, power brakes, and other safety features that can prevent or minimize the threat of death or serious bodily harm in a collision.  In addition, a car manufacturer must take all reasonable steps to ensure that, once a vehicle is running, it operates safely and its critical safety systems (such as engine control, braking, and airbag systems) work properly until such time as the driver shuts the vehicle down.

5.       Moreover, a manufacturer that is aware of dangerous design defects that cause its vehicles to shut down during operation, or the vehicles' airbags not to deploy, must promptly disclose and remedy such defects.

6.      Accordingly, Plaintiffs bring this damages action against New GM asserting claims for negligence, strict products liability, and fraudulent concealment.

## BACKGROUND

7.      Since at least 2000, GM has sold millions of vehicles throughout the United States and worldwide that have a safety defect in which the vehicle's ignition switch can inadvertently move from the "run" position to the "accessory" or "off" position during ordinary driving conditions, resulting in a loss of power, vehicle speed control, and braking, as well as a failure of the vehicle's airbags to deploy.

8.      There are at least two main reasons why the GM ignition switch systems are defective.  The first is that the ignition switch is simply weak and therefore does not hold the key in place in the "run" position.  On information and belief, the ignition switch weakness is due to a defective part known as a "detent plunger."

9.     The second reason that the ignition switch systems are defective is due to the low position of the switches in the GM vehicles referenced below. That causes the keys, and the fobs that hang off the keys, to hang so low in the GM vehicles that the drivers' knees can easily bump them and inadvertently shut down the vehicle.

10.     As used in this complaint, the "Defective Vehicles" refers to the GM vehicles sold in the United States that have defective ignition switches, defective power steering; defective airbags, defective seatbelts, and/or defective powertrains, including the following makes and model years:

- 2006 Chevrolet Cobalt (Recall 14V047000 and Others)

11.     Because of defects in their design, manufacture, and/or assembly, the ignition switch installed in the Defective Vehicles are, by their nature, loose and improperly positioned and are susceptible to failure during normal and expected conditions. The ignition module is located in a position in the vehicle that allows a driver to contact the key ring, and inadvertently switch the ignition position.

12.     Because of its faulty design and improper positioning, the ignition switch can unexpectedly and suddenly move from the "on" or "run" position while the vehicle is in operation to the "off" or "accessory" position (the "Ignition Switch Defect"), which can occur at any time during normal and proper operation of the Defective Vehicles, meaning the ignition can suddenly switch off while it is moving at 65 mph on the freeway, leaving the driver unable to control the vehicle.

13.     GM installed these defective ignition switch systems in models from at least 2000 through at least 2012.  GM promised that these vehicles would operate safely and reliably.  This promise turned out to be false in several material respects.  In reality, GM concealed and did not fix a serious quality and safety problem plaguing its vehicles.

14.     More importantly, the Ignition Switch Defect in GM's vehicles could have been easily avoided.  From at least 2005 to the present, GM received reports of crashes and injuries that put GM on notice of the serious safety issues presented by its ignition switch system.

15.     New GM has acknowledged that the Ignition Switch Defect has caused at least thirteen deaths.  New GM has refused, however, to disclose the identities of those it counts among these thirteen deaths.  Independent safety regulators have recorded 303 deaths associated with only the Saturn Ion and Chevrolet Cobalt Defective Vehicle models due to the Ignition Switch Defect. The actual number of deaths for all Defective Vehicle models is expected to be much higher, especially considering the Feinberg numbers of over 100.

16.     Despite the dangerous nature of this defect and its effects on critical safety systems, New GM concealed its existence and did not disclose to consumers that its vehicles – which GM for years had advertised as "safe" and "reliable" – were in fact neither safe nor reliable.

17.     New GM has now also acknowledged further defective ignition switches, defect airbags, defective power steering, defective seatbelts as well as defective powertrains in one or more of these vehicles.

18.     This case arises from the serious and permanent injuries sustained  by Plaintiff as a result of New GM's breach of its obligations and duties, including New GM's failure to disclose that, as a result of the Defects, at least 10 million or more New GM vehicles (and almost certainly more, including the vehicles complained of herein) may have or did have the propensity to shut down during normal driving conditions creating an extreme and unreasonable risk of accident, serious bodily harm, and death.

19.     Many of the Defective Vehicles were originally designed, manufactured, marketed, and placed into the stream of commerce by GM's predecessor. GM's predecessor, General Motors Corporation (referred to as "Old GM") also violated these obligations and duties by designing and marketing vehicles with defective ignition switch systems, and then by failing to disclose that defect even after it became aware that the ignition switch defect was causing fatal accidents.  In addition to the liability arising out of the statutory obligations assumed by New GM, New GM also has successor liability for the deceptive and unfair acts and omissions of Old GM because New GM has continued the business enterprise of Old GM with full knowledge of the Ignition Switch Defects.

20.     New GM's predecessor, Old GM filed for bankruptcy in 2009.  In July 2009, the bankruptcy court approved the sale of GM's predecessor to GM.  Notwithstanding the prior bankruptcy or contractual obligations under the sale agreement, New GM is liable for its own conduct.  From its inception in 2009 and while extolling the safety and reliability of its vehicles, New GM had its own independent knowledge of the defects in its vehicles, yet chose to conceal them.

21.     Specifically, New GM has actual knowledge that, because of the way in which the ignition was designed and integrated into the Defective Vehicles, the ignition switch can suddenly fail during normal operation, cutting off engine power and certain electrical systems in the cars, which, in turn, disables key vehicle components, safety features (like airbags), or other vehicle functions, leaving occupants vulnerable to crashes, serious injuries, and death.

22.     Although New GM had, and has had, actual knowledge of safety defects in the Defective Vehicles for years, they fraudulently concealed and continue to fraudulently

conceal material facts regarding the extent and nature of safety defects in the Defective Vehicles and what must be done to remedy the defects.

23.    New GM has not only fraudulently concealed material facts relating to the safety defects in the Defective Vehicles for years, but it has also made affirmative fraudulent and misleading statements, and it is continuing to make fraudulent and misleading statements to the public and to Plaintiffs regarding the nature and extent of the safety defects in the Defective Vehicles.

24.    Under the Transportation Recall Enhancement, Accountability and Documentation Act ("TREAD Act"),[1] and its accompanying regulations, when a manufacturer learns that a vehicle contains a safety defect, the manufacturer must promptly disclose the defect.[2] If it is determined that the vehicle is defective, the manufacturer must notify vehicle owners, purchasers, and dealers of the defect and must remedy the defect.[3]

25.    New GM also violated the TREAD Act by failing to timely inform NHTSA of the ignition switch defects and allowed cars to remain on the road with these defects. These same acts and omissions also violated various State consumer protection laws as detailed below.

26.    Upon information and belief, prior to the sale of the Defective Vehicles, New GM knew of the Ignition Switch Defect through sources such as pre-release design, manufacturing, and field testing data; in-warranty repair data; early consumer complaints made directly to New GM, collected by the National Highway Transportation

---

[1]    49 U.S.C.§§ 30101-30170
[2]    49 U.S.C. § 30118(c)(l) & (2).
[3]    49 U.S.C. § 30118(b)(2)(A) & (B)

Safety Administration's Office of Defect Investigation ("NHTSA ODI") and/or posted on public online vehicle owner forums; field testing done in response to those complaints; aggregate data from New GM dealers; and accident data. Yet, despite this knowledge, New GM failed to disclose and actively concealed the Ignition Switch Defect from Plaintiffs and the public, and continued to market and advertise the Defective Vehicles as reliable and safe vehicles, which they are not.

27.    In addition to the ignition switches, it is now believed that the faulty wiring system in the ignition switches also created the defective airbags and defective power steering, and that these defects resulted in the injuries and damages complained of herein.

28.    Plaintiffs were also damaged by the acts and omissions of Old GM for which GM is liable through successor liability.

## PARTIES

29.    Plaintiff KAITLYN WHETSTONE is a resident of Fenton, MO.

30.    General Motors Corporation (Old GM) was a Delaware corporation with its headquarters in Detroit, Michigan. The Corporation through its various entities designed, manufactured, marketed, distributed and sold Pontiac, Saturn, Chevrolet and other brand automobiles, including Plaintiffs' vehicles referenced herein, in New York, as well as multiple other locations in the United States and worldwide.

31.    In June of 2009, General Motors Corporation ("Old GM") filed for bankruptcy, and the United States Bankruptcy Court approved the sale of substantially all of Old GM's assets were sold pursuant to a Master Sales and Purchase Agreement ("Agreement").  The Agreement became effective on July 10, 2009.  The Agreement approved the sale of Old GM's assets to Defendant General Motors LLC ("New GM").

32. The Agreement defines Defendant's "Purchased Assets" as:

(xiv) all books, records, ledgers, files, documents, correspondence, lists, plats, specifications, surveys, drawings, advertising and promotional materials (in whatever form or medium), including Tax books and records and Tax Returns used or held for use in connection with the ownership or operation of the Purchased Assets or Assumed Liabilities, including the Purchased Contracts, customer lists, customer information and account records, computer files, data processing records, employment and personnel records, advertising and marketing data and records, credit records and information and other data:

(xv) all goodwill and other intangible personal property arising in connection with the ownership, license, use or operation of the Purchased Assets or Assumed Liabilities; ....

AMENDED AND RESTATED MASTER SALE AND PURCHASE AGREEMENT AT §2.2

33. Along with the Purchased Assets, New GM also expressly took on a range of liabilities. "Liabilities" is defined in the Agreement as "any and all liabilities and obligations of every kind and description whatsoever, whether such liabilities or obligations are known or unknown, disclosed or undisclosed, matured or unmatured, accrued, fixed, absolute, contingent, determined or undeterminable, on or off-balance sheet or otherwise, or due or to become due, including Indebtedness and those arising under nay Law, Claim, Order, Contract or otherwise."

34. Among many others, the Liabilities assumed by New GM under the agreement include:

(vii) (A) all Liabilities arising under express written warranties of Sellers [i.e., old GM] that are specifically identified as warranties and delivered in connection with sale of new, certified used or pre-owned vehicles or new or remanufactured motor vehicle parts and equipment (including service parts, accessories, engines and transmissions) manufactured or sold by Sellers or Purchaser [i.e., new GM] prior to or after the Closing and (B) all obligations under Lemon Laws; ...

(ix) all Liabilities to third parties for death, personal injury or other injury to Persons or damage to property caused by motor vehicles designed for operation on public roadways or by the component parts of such motor vehicles and, in each case, manufactured, sold or delivered by Sellers (collectively, "Product

Liabilities"), which arise directly out of accidents, incidents, or other distinct and discreet occurrences that happen on or after the Closing Date and arise from such motor vehicles' operation or performance; ...[4]

(xi)     all Liabilities arising out of, relating to, in respect of, or in connection with the use, ownership or sale of the Purchased Assets after the Closing; ...

35.     New GM also undertook contractual responsibility for compliance with a wide range of laws and other regulations, including:

> (a)     From and after the Closing, Purchaser [Defendant New GM] shall comply with the certification, reporting and recall requirements of the National Traffic and Motor Vehicle Safety Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code and similar Laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by Seller [Old GM].
>
> (b)     From and after the Closing, Purchaser [Defendant New GM] shall be responsible for the administration, management and payment of all Liabilities arising under (i) express written warranties of Sellers [Old GM]... (ii) Lemon Laws.

36.     Pursuant to the Agreement and other orders of the Bankruptcy Court, Defendant New GM purchased the assets of Old GM and hired many, if not most, of Old GM's employees, including, on information and belief, most of the same senior-level management, officers and directors.

37.     The allegations pertaining to Old GM are included herein because (a) with respect to Product Liability claims, New GM expressly assumed liability for the conduct of Old GM, and (b) the knowledge and conduct of Old GM was inherited by New GM from its inception, as it was known by Old GM employees when they became New GM employees and could further be ascertained from Old GM documents in New GM files.

---

[4] Pursuant to an order of the bankruptcy court, this particular category of assumed liabilities is "regardless of when the product was purchased."

This Complaint does not assert any causes of action against Old GM; all causes of action and attributions of liability are directed solely against Defendant New GM.

## JURISDICTION AND VENUE

38.    Plaintiffs' filing of this Complaint in this district does not alter the choice-of-law analysis and does not constitute a waiver of any of the Plaintiffs' rights to transfer to another district at the conclusion of pretrial proceedings in this case.  Plaintiffs have filed this Complaint in this district in order to advance the efficient and orderly resolution of claims arising from Defendant's conduct and its attendant nationwide devastating effects.  At the conclusion of pretrial proceedings in this case, Plaintiffs will be entitled to transfer of their claim to the state of their residence.

39.    This Court has diversity jurisdiction over this action under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000.00 and Plaintiffs are citizens of a different state than Defendant.

40.    Venue is proper in this District under 28 U.S.C. § 1391 because Defendant, as a corporation, is deemed to reside in any judicial district in which it is subject to personal jurisdiction.  Additionally, Defendant transacts business within the District, and some of the events establishing the claims arose in this District.

## FACTUAL ALLEGATIONS

### *The Defective Vehicles*

41.    As used in this Complaint, the "Subject Vehicles" refers to the following vehicles sold in the United States, which were equipped at the time of sale with an ignition switch sharing a common, uniform and defective design and/or defective airbags:

- 2005-2010 Chevrolet Cobalt
- 2006-2011 Chevrolet HHR
- 2006-2010 Pontiac Solstice

- 2003-2007 Saturn Ion
- 2007-2010 Saturn Sky
- 2005-2010 Pontiac G5
- 2010-2014 Chevrolet Camaro
- 2000–2005 Chevrolet Impala
- 2000-2005 Chevrolet Monte Carlo
- 1997-2003 Chevrolet Malibu
- 2004-2005 Chevrolet Malibu Classic
- 1999-2004 Oldsmobile Alero
- 1998-2002 Oldsmobile Intrigue
- 1999-2005 Pontiac Grand Am
- 2004-2008 Pontiac Grand Prix
- 2002 Cadillac CTS (Recall 14V394000, and others)
- 2006 Cadillac DTS (Recall 14V355000, and others)
- 2006 Pontiac Montana (Airbag Failed to Deploy)
- 2015 Chevrolet Cruze (Airbag Failed to Deploy)

42.    Plaintiffs' vehicles referenced above falls within this group of Subject Vehicles.

43.    The Saturn Ion was a compact car introduced in the United States in 2002 for the 2003 model year.  The Chevrolet Cobalt was a compact car introduced in the United States in 2004 for the 2005 model year.  The Chevrolet HHR was a front wheel drive, station wagon introduced in the United States in 2005 for the 2006 model year. The Pontiac Solstice was a sports car introduced in the United States in 2004 for the 2006 model year.  The Saturn Ion was a compact car introduced in the United States in 2002. The Saturn Sky was a roadster introduced in in the United States in 2005 for the 2007 model year.  The Pontiac G5 was a compact car introduced in the United States in 2007. The Fifth Generation Camaro was reintroduced in the Spring of 2009 for the 2010 Model Year.  The Eighth Generation Impala was reintroduced as the Hi-Mid in the 2000 Model Year.  The Sixth Generation Monte Carlo was reintroduced for the 2000 Model Year.  The Fifth Generation Malibu was reintroduced as a front wheel drive for the 1997 Model Year. The Sixth Generation Malibu Classic was reintroduced for the 2004 Model Year.  The

Oldsmobile Alero was a Midsized car that was introduced in 1998 for the 1999 Model Year. The Oldsmobile Intrigue was a mid-size sedan that was introduced for the 1998 Model Year. The Fifth Generation Pontiac Grand Am was introduced in late Spring for the 1999 Model Year. The Seventh Generation Grand Prix was introduced in 2002 for the 2004 Model Year. The First Generation Chevrolet Trailblazer was introduced for the 2001 Model Year. The Second Generation GMC Envoy was introduced for the 2002 Model Year. The Pontiac G6 was introduced for the 2004 Model Year. The Buick Enclave was introduced for the 2007 Model Year. The Buick Verano was launched in 2007. The Cadillac CTS was introduced in 2002 for the 2003 Model Year. The Cadillac DTS was introduced in 2005 for the 2006 Model Year. The second generation Pontiac Montana was introduced in 2005 for the 2006 Model Year. The Chevrolet Cruz was introduced in 2008.

44. To Plaintiff's knowledge and understanding, the vehicles involved in Plaintiffs' accidents referenced herein had not been substantially modified or changed in any material way from its initial condition as designed, manufactured, marketed and sold by Old GM.

45. The ignition switches in the Subject Vehicles contain several common switch points, including "run" (or "on"), "off" and "accessory." At the "run" position, the vehicle's motor engine is running and electrical systems have been activated; at the "accessory" position, the motor is off, and all electrical power is generally only supplied to the vehicle's entertainment system; and at the "off" position, both the vehicle's engine and electrical systems are turned off. In most vehicles, a driver must intentionally and manually turn the key in the ignition to move to these various positions.

46.     In the Subject Vehicles, a detent plunger in the ignition switch does not generate sufficient torque to keep the detent plunger component in position.  Thus, when the vehicle and/or ignition is jarred or any additional weight is added to the key ring, the detent plunger can move, switching the ignition from the "run" position to the "accessory" or "off" position.

47.     In addition, the Subject Vehicles contain a uniformly designed ignition cylinder, with the key position of the lock module on the steering column and an ignition key with a slot for a key ring at the top. By design, the ignition switch was placed low on the steering column, making it easy for a driver of regular height to inadvertently impact the ignition switch with his  or her knee while operating the vehicle. Such an impact may jar the ignition switch and cause it to move from the "run" to the "accessory" or "off" position.

48.     The ignition switch on the Subject Vehicles is prone to fail during ordinary and foreseeable driving situations (such as traveling across bumpy or uneven roadways or when the vehicle experiences extreme jarring movements). When the ignition switch "fails," and the ignition switch moves from the "run" to the "accessory" or "off" position during ordinary operation of the vehicle, the power to the vehicle is terminated (even at highway speeds), and the vehicle loses power steering and power brakes, which suddenly and without warning makes the vehicle difficult to control.

49.     Each of the Subject Vehicles also contains a uniformly designed airbag system that is disabled when the ignition switch on the vehicles fails during ordinary and foreseeable driving situations. Thus, as a result of the defective design of the Subject Vehicles, a driver whose ignition switch fails may suddenly and without warning

experience a vehicular power failure that also disables the vehicle's airbags, steering, and brakes. Such a failure may occur unexpectedly and during normal operation of the vehicle.

50.    The ignition switch systems at issue are defective in at least three major respects.  First, the switches are simply weak; because of a faulty and below specification "detent plunger," the switch can inadvertently move from the "run" to the "accessory" position. Second, because the ignition switch is placed low on the steering column, the driver's knee can easily bump the key (or the hanging keychain attachments) and cause the switch to inadvertently move from the "run" to the "accessory" or "off" position. Third, when the ignition switch moves from the "run" to the "accessory" or "off" position, the vehicle loses power, disabling critical safety systems such as power brakes, power steering, and airbags even if the vehicle is traveling at high speeds. This single point of failure is particularly dangerous given the susceptibility of the switch to inadvertent rotation due to, among other things, low torque, knee-key events, the use of a slotted head key design and/or heavy keys, and switch location.

51.    Both Old GM and Defendant New GM recognized that the defect was not limited to simply a low torque issue and were aware of safer alternative designs, but chose not to employ them due to cost and to avoid disclosure of the defective ignition switch and its tragic consequences. And while Defendant New GM has recalled millions of vehicles for defective ignition switches, it knew – and its own engineering documents reflect – that the defect transcends the low torque switch that was originally installed in Production Part Vehicles subject to NHTSA Recall No. 14V047000. Thus, Defendant New GM's recall of the Subject Vehicles has been, to date, incomplete and inadequate, and it underscores Defendant New GM's ongoing fraudulent concealment and misrepresentation of the nature and extent of the defects. Defendant New GM has long

known of and understood the ignition switch defect and failed to fully remedy the problems associated with this defect.

52.    The vehicles purchased by Plaintiffs contained the defective ignition switch and airbag system described in this Complaint.  The ignition switch defect precludes drivers and owners of the Subject Vehicles, such as Plaintiffs, from proper and safe use of their vehicles, reduces vehicle occupant protection, and endangers  Subject Vehicle occupants as  well as  those  in  vehicles  around  them.  Further, because  Old GM  and Defendant New GM concealed the existence of the ignition switch defect as defined herein, no driver or owner of the Subject Vehicles, including Plaintiffs, knew, or could reasonably have discovered, the ignition switch defect.

## NEW GM WAS AWARE OF THE IGNITION SWITCH DEFECT FROM THE DATE OF ITS CREATION, BUT CONCEALED THE DEFECT FOR YEARS.

53.    In 2009, Old GM declared bankruptcy in the United States Bankruptcy Court in the Southern District of New York.

54.    On July 9, 2009, the United States Bankruptcy Court approved the sale of Old GM, which was converted into Defendant New GM. From its inception, New GM, which retained the vast majority of Old GM's senior and management level executives and engineers, knew that Old GM had manufactured and sold millions of vehicles afflicted with the ignition switch defect. Some of the Old GM employees who obtained knowledge of the ignition switch defect within the scope of their employment at Old GM who were retained and given decision- making authority by New GM include current CEO Mary T. Barra; Director of Product Investigations Carmen Benavides; Safety Communications Manager Alan Adler; Program Engineering Manager Gary Altman; engineer Eric Buddrius, engineer Jim Federico; Vice Presidents for Product Safety John Calabrese and

Alicia Boler-Davis; Warranty Engineer William K. Chase; Engineer James Churchwell; Senior Manager for TREAD Reporting Dwayne Davidson; electrical engineer John Dolan; engineer and Field Performance Assessment Engineer Brian Everest; sensing performance engineer William Hohnstadt; Vice President of Regulatory Affairs Michael Robinson; Director of Product Investigations Gay Kent; Product Investigations Engineer Elizabeth Kiihr; engineer Alberto Manzor; Field Performance Assessment Engineer Kathy Anderson; General Counsel and Vice President Michael P. Milliken; Vehicle Chief Engineer Doug Parks; Brand Quality Manager Steven Oakley; Field Performance Assessment Engineer Manuel Peace; Manager of Internal Investigations Keith Schultz; Field Performance Assessment Engineer John Sprague; Field Performance Assessment Engineer Lisa Stacey; Design Engineer David Trush; Product Investigations Manager Douglas Wachtel; in-house counsel Douglas Brown; attorney Michael Gruskin (who at one point headed Old GM's product litigation team and chaired the Settlement Review Committee from September 2007 to March 2012); in-house product liability attorney Jaclyn C. Palmer; and in-house product liability lawyer William Kemp; and designer of the ignition switch and engineer Ray DeGiorgio. These employees' knowledge regarding the ignition switch defect is imputed to New GM, whenever obtained.

55.    On or around the day of its formation as an entity, New GM also acquired, *inter alia*, the knowledge of the contents of Old GM's "files" and company "documents." To that end, New GM acquired notice of the safety-related defects contained in Old GM's files, including numerous engineering reports, investigative reports, failure analyses, technical service bulletins, and other documentation concerning the defective ignition switch and airbag system described herein.

56.    Defendant New GM also had ongoing obligations under the Safety Act to

monitor both Old GM and New GM vehicles on the road, to make quarterly reports to NHTSA, and to maintain all relevant records for five years. Defendant New GM explicitly accepted Safety Act responsibilities for Old GM vehicles in § 6.15 of the Sale Agreement through which it acquired Old GM.

57.    The Safety Act and related regulations require the quarterly submission to NHTSA of "early warning reporting" data, including incidents involving death or injury, claims relating to property damage received by the manufacturer, warranty claims paid by the manufacturer, consumer complaints, and field reports prepared by the manufacturer's employees or representatives concerning failure, malfunction, lack of durability, or other performance issues. 49 U.S.C. § 30166(m)(3); 49 C.F.R. § 579.21. Manufacturers must retain for five years all underlying records on which the early warning reports are based and all records containing information on malfunctions that may be related to motor vehicle safety. 49 C.F.R. §§ 576.5 to 576.6.

58.    The Safety Act further requires immediate action when a manufacturer determines or should determine that a safety defect exists. United States v. General Motors Corp., 574 F. Supp. 1047, 1050 (D.D.C. 1983). A safety defect is defined by regulation to include any defect that creates an "unreasonable risk of accidents occurring because of the design, construction, or performance of a motor vehicle" or "unreasonable risk of death or injury in an accident." 49 U.S.C. § 30102(a)(8). Within five days of learning about a safety defect, a manufacturer must notify NHTSA and provide a description of the vehicles potentially containing the defect, including "make, line, model year, [and] the inclusive dates (month and year) of manufacture," a description of how these vehicles differ from similar vehicles not included in the recall, and "a summary of all warranty claims, field or service reports, and other information" that formed the basis

of the determination that the defect was safety related. 49 U.S.C. § 30118(c); 49 C.F.R. § 573.6(b)-(c). Then, "within a reasonable time" after deciding that a safety issue exists, the manufacturer must notify the owners of the defective vehicles. 49 C.F.R. §§ 577.5(a), 577.7(a). Violating these notification requirements can result in a maximum civil penalty of $15,000,000. 49 U.S.C. § 30165(a)(1).

59.     Defendant New GM used several processes to identify safety issues, including the TREAD database and Problem Resolution Tracking System ("PRTS"). The TREAD database, used to store the data required for the quarterly NHTSA early warning reports, was the principal database used by Old and New GM to track incidents related to Old and New GM vehicles. Id. at 306.  The database included information from (i) customer service requests; (ii) repair orders  from dealers; (iii) internal and external surveys; (iv) field reports from employees who bought Old and New GM vehicles and from Captured Test Fleet reports; (v) complaints from the OnStar call center; and (vi) a database maintained by Old and New GM legal staff to track data concerning complaints filed in court. A TREAD reporting team would conduct monthly database searches and prepare scatter graphs to identify spikes in the number of accidents or complaints related to various Old and New GM vehicles. The PRTS is a database that tracks engineering problems identified in testing, manufacturing, through warranty data, and through customer feedback. The PRTS process  involves  five steps:  identification of the issue; identification of  the root cause; identification of a solution; implementation of the solution; and feedback.

60.     Because the same employees carried out the TREAD Act obligations at Old GM and Defendant New GM, they not only retained the knowledge they acquired at Old GM—they were in fact required to do so. This further supports the propriety of imputing

the knowledge of Old GM employees to New GM, even where that knowledge stems in part from their performance of the same or similar roles at Old GM.

61.     In setting forth the knowledge and conduct of Old GM in connection with the ignition switch and other defects set forth herein, Plaintiff alleges that New GM is liable for the actions of Old GM only with respect to the Products Liability claims for compensatory damages which are an Assumed Liability. With respect to Plaintiff's Independent Claims, Plaintiff does not seek to hold Defendant New GM liable for the actions of Old GM.  Instead, the knowledge and conduct of Old GM is generally important and relevant because it is imputed to Defendant New GM under governing principles of agency law.

## NEW GM LEARNS OF THE IGNITION SWITCH DEFECT

62.     From the day of its formation as a corporate entity, through the knowledge of Old GM employees familiar with this information who continued on at New GM after the bankruptcy sale and Old GM documents retained in New GM's files, New GM acquired notice and full knowledge of the following:

63.     In 2001, during pre-production testing of the 2003 Saturn Ion, Old GM engineers learned that the vehicle's ignition switch could unintentionally move from the "run" to the "accessory" or "off" position. Old GM further learned that  where  the ignition switch moved from "run" to the "accessory" or "off" position, the vehicle's engine would stall and/or lose power. In a section of an internal report titled, "Root  Cause Summary," Old GM engineers identified two "causes of failure," namely: "[l]ow contact force and low detent plunger force."

64.     Delphi Automotive PLC ("Delphi"), the manufacturer of the ignition switches,[5] informed Old GM that the ignition switch did not meet Old GM's torque specifications. The Design Release Engineer for the Ion ignition switch, Ray DeGiorgio, specifically discussed with Delphi the fact that the switches did not meet the torque required by Old GM's specifications.

65.     DeGiorgio also corresponded with representatives of Koyo, the supplier of the Ion steering column into which the ignition switch was to be installed. In his correspondence, DeGiorgio stated that ten of twelve prototype ignition switches recently provided by Delphi "[f]ailed to meet engineering requirements," and remarked that the "failure is significant."

66.     Nonetheless, rather than delay production of the Saturn Ion, and redesign the ignition switch in order to ensure that it met Old GM's specifications, Mr. DeGiorgio went ahead and approved use of ignition switches he knew did not meet Old GM's design specifications.

67.     Old GM contracted with Continental Automotive Systems US, Inc. ("Continental") to manufacture the airbag system, including the sensing system, in the Subject Vehicles, including the 2003 Saturn Ion.

68.     The airbag system in the Subject Vehicles was defectively designed so that it would shut off and the airbags would not deploy when the key in the ignition turned from the "run" to the "accessory/off" position during foreseeable driving operation.

---

[5] The ignition switch "was developed as a 'corporate common' part, meaning that it was designed to be used in multiple vehicle platforms." REPORT TO BOARD OF DIRECTORS OF GENERAL MOTORS COMPANY REGARDING IGNITION SWITCH RECALLS at 19 (May 29, 2014) (hereinafter, "Valukas Report"). The defective ignition switches were installed in, inter alia, the Chevrolet HHR, Chevrolet Cobalt, Saturn Ion, Saturn Sky, Pontiac G5, and Pontiac Solstice. Id. at 18-19. The use of common ignition switches across vehicles makes was a method to reduce costs. Id.

69.     In 2002, Old GM began manufacturing and selling 2003 Saturn Ions with the defective ignition switches and defective airbag systems.

70.     In 2004, Old GM engineers reported that the ignition switch on the Saturn Ion was so weak and placed so low on the steering column that the driver's knee could easily bump the key and turn off the vehicle.

71.     The defect was sufficiently serious that an Old GM engineer, Gerald A. Young, report in January 2004 that "[t]he ignition switch is too low.  All other keys and the key fob hit on the driver's right knee. The switch should be raised at least one inch toward the wiper stalk." Young then concluded that "[t]his is a basic design flaw  and should be corrected if we want repeat sales.

72.     Mr. Young was not alone in his observations. In a February 19, 2004 report concerning his model year 2004 Saturn Ion, Old GM employee Onassis Matthews stated, "The location of the ignition key was in the general location where my knee would rest (I am 6' 3" tall, not many places to put my knee). On several occasions, I inadvertently turn [sic] the ignition key off while driving down the road. For a tall person, the location of the ignition key should be moved to a place that will not be inadvertently switched to the off position."

73.     Two months later, in an April 15, 2004 report concerning his model year 2004 Saturn Ion, Old GM employee Raymond P. Smith described a moving stall: "I thought that my knee had inadvertently turned the key to the off position."

74.     Meanwhile, a July 1, 2004 report by Siemens VDO Automotive analyzed the relationship between the ignition switch in Old GM vehicles and the airbag system. The Siemens report concluded that when an Old GM vehicle experienced a power failure, the

airbag sensors were disabled. The Siemens report was distributed to at least five Old GM engineers.

75.     The Chevrolet Cobalt was in pre-production at this time. In spite of the problems reported with the Saturn Ion's switch, Old GM installed the same ignition switch and airbag system in the 2005 Cobalt as it had in the Ion.

76.     Unsurprisingly, reports of moving stalls surfaced almost immediately around the time of the Cobalt's production launch in 2004.  At a press event in the summer or fall of 2004, a journalist  informed Doug Parks,  the Cobalt Chief Engineer, that while adjusting his seat in the Cobalt he was test driving, the journalist had inadvertently turned off the car by hitting his knee against the key fob or chain. Parks asked Gary Altman, the Program Engineering Manager, to follow up on the complaint by trying to replicate the incident and to determine a fix. Altman thereafter replicated the incident at an Old GM testing facility.

77.     Mr. DeGiorgio  learned about the moving stall at the press event in 2004 and was approached by an Old GM engineer who suggested that Old GM should "beef up" the ignition switch detents.  DeGiorgio rejected this idea.

78.     Around this same time, Old GM opened an engineering inquiry known as a Problem Resolution Tracking System (PRTS) to address the complaint from the press event that a Cobalt could be "keyed off with knee while driving." At this time, PRTS issues were analyzed by a Current Production Improvement Team (CPIT). The CPIT that examined the Cobalt issue beginning in November 2004 included a cross-section of business people and engineers, including Gary Altman and Lori Queen, Vehicle Line Executive on the case.

79.     Old GM considered a number of potential solutions to the problem during the PRTS, including changes to the key position on the lock module and measures to increase the torque in the ignition switch. Indeed, the CPIT characterized a suggestion to change the location of the ignition switch on the steering column from a low-mount to a higher mount as a "sure solution," but rejected it because it was too expensive. Old GM also considered changing the key from a slot to a hole configuration.

80.     Changing the key from a slot to a hole configuration would reduce the lever arm of the key and key chain. With the slot design, the key hangs lower on the key, which increases the torque force on the ignition switch when the chain is contacted or moved in any way. Old GM engineers determined that changing the key to a hole configuration would lessen the consequences of impacts on the key and significantly reduce the chance that the key would inadvertently move from the "run" to the "accessory/off" position during ordinary driving maneuvers.

81.     Old GM engineer David Trush determined that redesigning the key to a hole design would have cost less than one dollar per vehicle.

82.     In the end, however, Old GM engineers and executives decided to do nothing. In March of 2005, Mr. Altman, who was the Cobalt Program Engineering Manager, issued a directive to close the November 2004 PRTS with no action. The rationale of Old GM's decision makers was that the "lead-time for all solutions is too long" and the "tooling cost and piece price are too high." Thus, "none of the solutions represents an acceptable business case"—a standard phrase used by Old GM when closing a PRTS without action due to cost. David Thrush, the Design Release Engineer for the Cobalt ignition cylinder, explained that an "acceptable business case" is one  whose solution should solve the issue, be cost effective, and have an acceptable lead time to implement

the change. But one of the very solutions proposed by Thrush—changing the ignition key from a slot to a hole configuration—would have cost less than one dollar per vehicle.

83.    Not only did Old GM close the PRTS with no action, it also downplayed the severity of the safety threat posed, rating the specter of a moving stall (even at highway speeds) with a severity level of 3—on a scale of 1 (most severe) to 4 (least severe).

84.    On February 28, 2005, Old GM issued a bulletin to its dealers regarding engine-stalling incidents in 2005 Chevrolet Cobalts and 2005 Pontiac Pursuits (the Canadian version of the Pontiac G5).

85.    In the February 28, 2005 bulletin, Old GM provided the following recommendations and/or instructions to its dealers—but did not provide this information to the public in general:

> There is potential for the driver to inadvertently turn off the ignition due to low key ignition cylinder torque/effort. The concern is more likely to occur if the driver is short and has a large heavy key chain.
>
> In the cases this condition was documented, the driver's knee would contact the key chain while the vehicle was turning. The steering column was adjusted all the way down. This is more likely to happen to a person that is short as they will have the seat positioned closer to the steering column.
>
> In cases that fit this profile, question the customer thoroughly to determine if this may be the cause. The customer should be advised of this potential and to take steps, such as removing unessential items from their key chains, to prevent it.
>
> Please follow this diagnosis process thoroughly and complete each step. If the condition exhibited is resolved without completing every step, the remaining steps do not need to be performed.

86.    At this time, Old GM knew that drivers were inadvertently turning off the vehicles due to design defects in the ignition switches installed in those vehicles, and not only because "short" drivers were impacting the steering column or because drivers' key chains were "heavy."

87.    Old GM failed to disclose and, in fact, concealed the February 28, 2005 bulletin, as well as the information contained therein, to Cobalt and Pursuit owners/lessees, and sent affirmative representations to dealers that did not accurately describe the nature of the problem, the multiple design steps needed for a solution to the problem, and Old GM's knowledge of the problem.

88.    Indeed, rather than disclosing this serious safety problem that uniformly affected all Chevrolet Cobalts, Old GM instead concealed and obscured the defect-related problems, electing to wait until customers brought their cars to a dealership after an engine-stalling incident had occurred. Further, Old GM offered even its own dealers an incomplete, incorrect, and insufficient description of the defects and the manner in which to actually remedy them.

89.    As of February 2005, Old GM engineers knew that the Chevrolet Cobalt ignition switches were defectively designed as discussed in this Complaint.

90.    Pursuant to 49 C.F.R. § 573.6, which requires an automobile manufacturer to "furnish a report to the NHTSA for each defect . . . related to motor vehicle safety," Old GM had a duty to disclose the safety-related defects in the Chevrolet Cobalt and all other Subject Vehicles as soon as it knew of them.

91.    Instead of complying with its legal obligations, however, Old  GM fraudulently concealed the ignition switch defect from the public and continued to manufacture and sell the Subject Vehicles with known safety defects.

92.    Between February 2005 and December 2005, Old GM continued to receive reports of moving stalls and/or power failures in the Subject Vehicles. Indeed, Old GM opened multiple PRTS inquiries during this time period regarding reports of power failure and/or engine shutdown in Subject Vehicles.

93.     As part of one such PRTS, Quality Brand Manager Steven Oakley asked William Chase, an Old GM warranty engineer, to estimate the warranty impact of the ignition switch defect in the Cobalt vehicles. Chase estimated that for Cobalt vehicles on the road for 26 months, 12.40 out of every 1,000 vehicles would experience inadvertent power failure while driving. Old GM did not provide this information to its dealers, to regulators, or to the general public.

94.     In May 2005, a customer demanded that Old GM repurchase his Cobalt. The complainant stated that the ignition switch shut off during normal driving conditions with no apparent contact between the driver's knee and key chain or fob. Steven Oakley forwarded this information internally, stating that the ignition switch "goes to the off position too easily[,] shutting the car off." Oakley's email was forwarded to DeGiorgio.

95.     The problem with moving stalls began to receive increased press attention in May and June of 2005. On May 26, 2005, a writer for the Sunbury Daily Item in Pennsylvania reviewed the Cobalt and reported that "[u]nplanned engine shutdowns happened four times during a hard-driving test last week. . . . I never encountered anything like this in 37 years of driving and I hope I never do again." Similarly, a writer for the New York Times reported that his wife experienced a moving power failure while driving a Cobalt.

96.     At or around the late spring of 2005, Old GM, through Product Safety Communications Manager Alan Adler (who now works for New GM), issued the following statement regarding customer-reported engine-stalling events in the Chevrolet Cobalt:

> In rare cases when a combination of factors is present, a Chevrolet Cobalt driver can cut power to the engine by inadvertently bumping the ignition key to the accessory or off position while the car is running.

When this happens the Cobalt is still controllable. The engine can be restarted after shifting to neutral.

GM has analyzed this condition and believes it may occur when a driver overloads a key ring, or when the driver's leg moves amid factors such as steering column position, seat height and placement. Depending on these factors, a driver can unintentionally turn the vehicle off.

Service advisers are telling customers they can virtually eliminate this possibility by taking several steps, including removing non- essential material from their key rings.

Ignition systems are designed to have "on" and "off" positions, and practically any vehicle can have power to a running engine cut off by inadvertently bumping the ignition from the run to the accessory or off position.

Old GM's statement was demonstrably misleading and false.

97.    For example, contrary to the above-referenced statement, Old GM's internal testing documents showed that these incidents occurred when drivers were using keys with the standard key fob. Old GM knew that these incidents were not only caused by drivers with heavy key chains or as a result of a driver's seating position. Old GM knew that removing non-essential items from a key chain would not "virtually eliminate" the possibility of power failure.

98.    Further, Old GM's above-referenced statement was demonstrably false and misleading because Old GM knew that safety incidents related to the ignition switches were the result of the safety-related defects identified in the November 2004 PRTS.

99.    The negative media coverage, however, was becoming concerning. As a result, Old GM tasked its Product Investigations unit to examine the ignition switch defect. The Product Investigations unit typically was charged with solving significant engineering problems, both of customer satisfaction and product safety. Product

Investigations Manager Doug Wachtel and his team examined early data from the field and found 14 incidents related to the ignition switch. Wachtel and company also tried to recreate moving stalls themselves. In this vein, Wachtel and Gay Kent drove a Cobalt around Old GM's property in Warren, Michigan. Ms. Kent had a long and heavy key chain, and was able to knock the ignition from "run" to "accessory" simply by moving her leg so that her jeans caused friction against the fob.

100.    The Product Investigations unit, in spite of its findings, concluded that the ignition switch problem was not of sufficient seriousness to warrant a recall. At this time, Old GM knew that a defect existed in its vehicles, but it downplayed and denied the magnitude of the problem, and did nothing to disclose the issue to its customers.

101.    The failure to act did not end here. Around June 7, 2005, DeGiorgio was asked to propose a change to the ignition switch that would double the torque required to turn the switch. DeGiorgio identified two possibilities. First, he proposed using a switch under development for the Saturn Vue and the Chevrolet Equinox (the "GMT 191"). Because the GMT 191 switch was superior to the current ignition switch both electrically and mechanically, DeGiorgio referred to it as the "gold standard of ignition switches." Second, DeGiorgio proposed redesigning the ignition switch already in use. Part of DeGiorgio's plan for this latter option included adding a second detent plunger.

102.    On June 14, 2005, Old GM's Vehicle and Process Integration Review (VAPIR) team for the Cobalt met to discuss potential solutions to the moving stall issue. Proposed solutions were categorized as either "short-term" or "long-term." As a proposed short-term solution, Old GM engineers proposed using a smaller key ring and replacing the slotted key head with one that contained a hole. (This was the same solution proposed by David Trush during the November 2004 PRTS.) Old GM's long- term

solution centered on DeGiorgio's proposal to replace the ignition switch with the GMT 191, or "gold standard" switch. The GMT 191 would allegedly double the torque required to turn the ignition. Old GM engineers proposed to implement the new switch beginning with model year 2007 or 2008 vehicles at a cost of just $1.00 per vehicle, plus tooling costs.

103.    Shortly after its June 14, 2005 meeting, the Cobalt VAPIR team approved a "fix" for existing customers that would address the slotted key heads: a plug capable of insertion into the key head to eliminate the slot along the head of the key. The VAPIR team also approved a redesign of keys for future model year vehicles to eliminate the slot design (a change that was not implemented). Old GM then issued a Preliminary Information to its dealers, explaining that the key insert was available for 2005 Chevrolet Cobalt vehicles. The key insert solution did not, however, address the core problem of low torque and the low placement of the ignition switch on the steering cylinder. Indeed, Old GM's engineers regarded the keyhead design change as only a temporary solution— or, as one Old GM engineer described it, a "band-aid." Old GM's failure to take decisive action to address the defect would soon prove fatal.

104.    On June 29, 2005, an Old GM customer filed the following complaint (and succinctly identified the safety risk) regarding a 2005 Cobalt and its tendency to lose power during ordinary driving scenarios:

Dear Customer Service:

This is a safety recall issue if ever there was one. . . . The problem is the ignition turn switch is poorly installed. Even with the  slightest touch, the car will shut off while in motion. I don't have  to list to you the safety problems that may happen, besides an accident or death, a car turning off while doing a high speed . . . .

105.    Just weeks later, in July of 2005, Old GM received notice that Amber Marie Rose, a 16 year old resident of Clinton, Maryland, was killed in an accident after her 2005 Chevrolet Cobalt drove off the road and struck a tree head-on. The airbags in Ms. Rose's Cobalt did not deploy during this frontal collision. NHTSA opened an investigation and hired Calspan Crash Data Research to conduct a Special Crash Investigation (SCI). The SCI determined that the ignition switch in Ms. Rose's Cobalt was in the "accessory" position at the time of collision. Upon information and belief, Old GM subsequently entered into a confidential settlement agreement with Ms. Rose's mother.

106.    In December 2005, Old GM issued a Technical Service Bulletin (05-02- 35-007) (the "TSB"). The TSB applied to 2005-2006 Chevrolet Cobalts, 2006 Chevrolet HHRs, 2005-2006 Pontiac Pursuits, 2006 Pontiac Solstices, and 2003-2006 Saturn Ions, all of which contained uniformly designed defective ignition switches. The TSB, which was issued only to Old GM dealers, was captioned, "Information on inadvertent Turning of Key Cylinder, Loss of Electrical System and no DTCs." The TSB stated:

> There is potential for the driver to inadvertently turn off the ignition due to low ignition key cylinder torque/effort.
>
> The concern is more likely to occur if the driver is short and has a large and/or heavy key chain. In these cases, this condition was documented and the driver's knee would contact the key chain while the vehicle was turning and the steering column was adjusted all the way down. This is more likely to happen to a person who is short, as they have the seat positioned closer to the steering column.
>
> In cases that fit this profile, question the customer thoroughly to determine if this may be the cause. The customer should be advised of this potential and should take steps to prevent it—such as removing unessential items from their key chain. . . .

107.    As with its prior bulletin regarding the Subject Vehicles, the information Old GM provided in the TSB was false and misleading.

108.    For example, the TSB intentionally omitted use of the word "stall," which was language Old GM knew was a red flag to regulators. Old GM Quality Service Manager Steven Oakley, who drafted the December 2005 TSB, stated that the  term "stall" is a "hot" word that Old GM did not use in TSBs because it may raise a concern about vehicle safety and thereby suggest that a recall, not a TSB, is appropriate. Old GM personnel also stated that "there was concern about the use of 'stall' in a TSB because such language might draw the attention of NHTSA."3 Old GM's intentional omission of the word "stall" to avoid NHTSA scrutiny demonstrates that Old GM recognized that moving stalls present a safety issue. Rather than describe the defective condition accurately, Old GM used language to obfuscate the problem at hand.

109.    Further,  the TSB failed to mention that when the  ignition switch turns to the "accessory" or "off" position, it will disable the airbags, cut the engine, and disable power steering and brakes.

110.    At the time it issued the TSB, Old  GM knew that power failure incidents were happening to drivers of all heights and sizes, and to drivers with no extra items on their key chains.

111.    Between November 2005 and March 2006, Old GM  learned  of  at  least three incidents in which operators of Chevrolet Cobalt vehicles lost control of the vehicle and experienced front-end collisions in which the airbags of the vehicle failed to deploy. In two of these incidents, data obtained from the vehicle's Sensory Diagnostic Module (SDM) showed that the vehicle was in the "accessory" position just before impact. Old GM opened  internal  investigations  into  each  of  these  three  incidents  but  generally  did nothing.

112.    On April 24, 2006, Ray DeGiorgio approved plans to redesign the ignition switch in an attempt to improve the switch's torque performance. The redesign plan, inter alia, included a new detent plunger and spring in the detent plunger. These newer switches, which were secretly installed in certain model year 2007 and 2008-2011 model year Subject Vehicles, are sometimes referred to as Catera-spring switches.

113.    In spite of this redesign, Old GM did not issue a corresponding change of the ignition switch's part number. Upon information and belief, Old GM neglected to change the part number in an effort to conceal its redesign of the ignition switch. Government regulators would later explain that this action—concealing the part change by applying the same part number to the redesigned ignition switches—prevented NHTSA from discovering the ignition switch defect for years.

114.    Indeed, New GM CEO Mary Barra acknowledged in April 2014 that the failure to change the part number for the ignition switches was inappropriate and did not meet industry standard behavior.

115.    Furthermore, and in spite of the redesign, the ignition switches continued to fall short of Old GM's design specifications for torque performance. Although the modified, Catera-spring switches had higher average torque than the Delta-spring switches installed in 2003-06 and certain 2007 model year Subject Vehicles, Old GM and Delphi knew through switch testing conducted in 2005-06 that the Catera-spring switches also failed Old GM's torque specification. In fact, the same day that DeGiorgio approved the secret switch part change to the Catera-spring switch, test results from Delphi showed that the new Catera-spring switch was still below specification. The redesigned ignition switches therefore continued to be defective as designed and manufactured.

116.    In October 2006, Old GM again updated the TSB (#05-02-35- 007) to include additional model years: the 2007 Chevrolet Cobalt, the 2007 Chevrolet HHR, the 2007 Pontiac G5, the 2007 Pontiac Solstice, the 2007 Saturn Ion, and the 2007 Saturn Sky. These model year vehicles possessed the same safety-related defects as the vehicles included in the original TSB.

117.    In August 2007, Old GM met with Continental to review the SDM data from a crash involving a 2005 Chevrolet Cobalt where the airbags failed to deploy, resulting in a fatal injury. By this time, Continental had knowledge of the safety-related defects discussed in this Complaint. Neither Old GM nor Continental shared the results of this meeting with relevant regulatory authorities or the public.

118.    The next month, the Chief of the Defect Assessment Division within the Office of Defects Investigation of NHTSA proposed that the agency investigate "frontal airbag non-deployment in 2003-2006 Chevrolet Cobalt/Saturn Ion." The proposal was prompted by a "pattern of reported non-deployments" that were "first observed in early 2005." According to the Chief of the Defect Assessment Division, and in response to inquiries from NHTSA, GM "indicat[ed] that they see no specific pattern."

119.    At this time, Old GM knew of the problems related to airbag non-deployment in the Chevrolet Cobalt vehicles and, according to this email, was deliberately misleading NHTSA about its knowledge of these problems. Old GM knew, for example, that its airbag systems would become disabled when the ignition switch to a vehicle moved from the "run" position to the "accessory" or "off" position during normal operation of the vehicle. All the while, however, Old GM also knew that NHTSA believed that in most, if not all vehicles, the airbag systems were operable for several seconds

following a power loss. Thus, Old GM knew that NHTSA was mistaken and did nothing to correct NHTSA's mistaken belief.

120.    What is more, between December 2006 and October 2007, Old GM learned of at least five fatal accidents involving frontal collisions in Subject Vehicles wherein the airbags failed to deploy due to the ignition switch defect.

121.    The Acting Administrator of NHTSA, David Friedman, testified in 2014 that Old GM withheld data from NHTSA regarding the likelihood of airbag non-deployment in the Subject Vehicles during this time period. Old GM withheld this data in an effort to thwart any investigation by NHTSA and to avoid a recall of the Subject Vehicles.

122.    Old GM's concealment and obfuscation was not limited to its dealing with NHTSA. In the 2008 iteration of its annual "Vehicle Recall Awareness Presentation," Old GM instructed its employees to avoid using the following "judgment" words in their descriptions of vehicle problems:

| | | |
|---|---|---|
| always | detonate | maniacal |
| annihilate | disemboweling | mutilating |
| apocalyptic | enfeebling | never |
| asphyxiating | evil | potentially-disfiguring |
| bad | evicscerated [sic] | power [sic] keg |
| Band-Aid | explode | problem |
| big time | failed | safety |
| brakes like an "X" car | flawed | safety related |
| cataclysmic | genocide | serious |
| catastrophic | ghastly | spontaneous combustion |
| Challenger | grenadelike | startling |
| chaotic | grisly | suffocating |
| Cobain | gruesome | suicidal |
| condemns | Hindenburg | terrifying |
| Corvair-like | hobbling | Titanic |
| crippling | horrific | tomblike |
| critical | impaling | unstable |
| dangerous | inferno | widow-maker rolling sarcophagus (tomb or coffin) |

| | | |
|---|---|---|
| deathtrap | Kevorkianesque | Words or phrases with biblical connotation |
| debilitating | lacerating | |
| decapitating | life-threatening | |
| defect | maiming | |
| defective | mangling | |

123.   Instead of using commonsense language, Old GM employees were advised in Orwellian fashion to use specific words to avoid disclosure and documentation of the material safety risks associated with Old GM products, and in so doing furthered the cover-up and fraud through intentional (and misleading) word substitutions, such as:

- "Issue, Condition [or] Matter" instead of "**Problem**"
- "Has Potential Safety Implications" instead of "**Safety**"
- "Does not perform to design" instead of "**Defect/Defective**"

124.   Old GM knew its defective vehicles were killing and/or maiming  its customers, but it nonetheless instructed its employees to avoid words like "defect" or "safety"—words that accurately described the issues. Instead of publicly admitting the dangerous safety defects in its vehicles, Old GM repeatedly blamed accidents on driver error.

125.   Upon information and belief, Old GM's policy against "judgment" words, and linguistic obfuscation in general, was adopted and continued on by New GM after the bankruptcy sale.

126.   In February 2009, Old GM opened another Problem Resolution regarding the defective ignition switches. Old GM engineers decided at this time to change the top of the key from a "slot" to a "hole" design, as had originally been suggested in 2005, because it knew that this design change would help prevent accidental ignition shut off for customers with heavy key chains. The new key design was produced as a running change for the forthcoming 2010 model year vehicles. As a result, none of the previously

manufactured Delta-platform vehicles – including the 2009 HHR – were equipped with the newly redesigned key head. Indeed, Plaintiffs' ignition key at the time of the accident featured the "slot" design that Old GM knew to be more susceptible to inadvertent key rotation.

127.    Just prior to Old GM's bankruptcy sale, Old GM met with Continental Automotive Systems US, its SDM supplier for the Cobalt, Ion, and other Defective Ignition Switch Vehicles. Old GM requested that Continental download advanced SDM data from a 2006 Chevrolet Cobalt accident where the airbags failed to deploy.   In a report dated May 11, 2009, Continental analyzed the SDM data and concluded that the SDM had received one or more "power off" messages prior to impact, which disabled the airbags. Old GM did not disclose this finding to NHTSA, despite its knowledge that NHTSA was interested in airbag non-deployment incidents in Chevrolet Cobalt vehicles.

## NEW GM CONCEALED A KNOWN DEFECT
## AFTER THE BANKRUPTCY SALE

128.    From its inception, New GM had full knowledge of the defects with the ignition switch and airbag system, and Old GM's failure to disclose those defects to NHTSA and the public—or, for that matter, to the Bankruptcy Court. Had New GM acted when it acquired knowledge of the ignition switch defect, Plaintiffs would likely not have been involved in the accidents referenced herein—years after New GM acquired Old GM's assets in the bankruptcy sale.

129.    Rather than promptly recalling the Subject Vehicles, however, New GM fraudulently concealed the existence of the safety defects in the Subject Vehicles. Moreover,  New GM continued to manufacture vehicles with the ignition switch defect

after it emerged from bankruptcy. Indeed, hundreds of thousands of the vehicles manufactured by New GM have since been recalled due to the ignition switch defect.

130.    In March 2010, New GM recalled nearly 1.1 million Cobalt and Pontiac G5 models for faulty power steering issues. In recalling these vehicles, New GM recognized that loss of power steering, standing alone, was grounds for a safety recall. Yet, incredibly, New GM now claims it did not view the ignition switch defect (which disables power steering as well as other functions) as a "safety issue," but only a "customer convenience issue." Despite its knowledge of the ignition switch defect, New GM did not include the ignition switch defect in this recall. Further, although the Plaintiffs' vehicles used the same steering system as the Cobalt and Pontiac G5 (and had the same ignition switch defect), New GM did not recall any the Plaintiffs' vehicles at this time.

131.    Just days after the power steering recall, the deadly ignition switch took another life. On March 10, 2010, Brooke Melton was driving her 2005 Chevrolet Cobalt on a two-lane highway in Paulding County, Georgia. While she was driving, her key turned from the "run" to the "accessory/off" position causing her engine to shut off. After her engine shut off, she lost control of her Cobalt, which traveled into an oncoming traffic lane, where it collided with an oncoming car. Ms. Melton was killed in the crash. And the deaths did not stop here.

132.    On December 31, 2010, in Rutherford County, Tennessee, a 2006 Cobalt traveled off the road and struck a tree. Although there was a frontal impact in this incident, the front airbags failed to deploy. The download of the SDM later showed the key was in the "accessory/off" position at the time of the crash. New GM received notice of this incident, opened a file, and referred to it as the "Chansuthus" incident.

133.    Also on December 31, 2010, in Harlingen, Texas, a 2006 Cobalt traveled off the road and struck a curb. Although there was a frontal impact, the front airbags failed to deploy. New GM received notice of this incident, opened a file, and referred to it as the Najera" incident.

134.    On March 22, 2011, ESIS investigator, Ryan Jahr, a New GM engineer, downloaded the SDM from Brooke Melton's Cobalt. The information from the SDM download showed that the key in the Cobalt turned from the "run" to the "accessory/off" position 3-4 seconds before the crash. On June 24, 2011, Brooke Melton's parents filed a lawsuit against New GM.

135.    In August 2011, New GM assigned Engineering Group Manager Brian Stouffer to assist with a Field Performance Evaluation (FPE) that it had opened to investigate frontal airbag non-deployment incidents in Chevrolet Cobalts and Pontiac G5s.

136.    On December 18, 2011, in Parksville, South Carolina, a 2007 Cobalt traveled off the road and struck a tree. Although the vehicle sustained a frontal impact, the front airbags did not deploy. A subsequent download of the SDM showed that the ignition key was in the "accessory/off" position at the time of impact. New GM received notice of this incident, opened a file, and referred to it as the "Sullivan" incident.

137.    In early 2012, Brian Stouffer asked Jim Federico (who reported directly to Mary Barra at the time) to oversee the FPE investigation into frontal airbag non-deployment incidents. Federico was named the "executive champion" for the investigation to help coordinate resources.

138.    In May 2012, New GM engineers tested the torque on numerous ignition switches of 2005-2009 Cobalt, 2007-2009 Pontiac G5, 2006-2009 HHR, and 2003-

2007 Ion vehicles that were parked in a junkyard. The results of these tests showed that the torque required to turn the ignition switches from the "run" to the "accessory/off" position in most of these vehicles did not meet Old and New GM's minimum torque specification requirements. Even vehicles from model years 2008-2009, after Ray DeGiorgio approved the redesign of the ignition switch, by and large failed to meet Old and New GM's torque specifications. These results were reported to Stouffer and other members of the FPE.

139.    In September 2012, Stouffer requested assistance from a "Red X Team" as part of the FPE investigation. The Red X Team was a group of engineers within GM assigned to find the root cause of the airbag non-deployments in front-end accidents involving Chevrolet Cobalts and Pontiac G5s. By that time, however, it was clear that the root cause of the airbag non- deployments in a majority of the front-end accidents was the defective ignition system.

140.    Indeed, Mr. Stouffer acknowledged in his request for assistance that the Chevrolet Cobalt could experience a power failure during an off road event, or if the driver's knee contacted the key and turned off the ignition. Mr. Stouffer further acknowledged that such a loss of power could cause the airbags not to deploy. In other words, Mr. Stouffer knew full well the reasons for the airbag non-deployments, yet he requested additional assistance in order to stall and/or ignore the problem.

141.    At this time, New GM did not provide the information that it had developed during the FPE to NHTSA or the public.

142.    Under 49 C.F.R. § 573.6, New GM had a duty in 2012, when it clearly was aware of the ignition switch defect, to disclose the defect in the Subject Vehicles. Rather

than comply  with its legal obligations, New GM continued to fraudulently conceal this defects from the public and the US government.

143.    Had New GM complied with its obligations under § 573.6, a recall may have been implemented and prevented this accident.

144.    Acting NHTSA Administrator David Friedman recently stated, "at least by 2012,  New GM staff was very explicit about an unreasonable risk to safety" from the ignition switches in the Subject Vehicles.

145.    Mr. Friedman continued: "New GM engineers knew about the defect. [New] GM lawyers knew about the defect. But [New] GM did not act to protect Americans from the defect."

146.    There is significant evidence that multiple in-house attorneys knew of and understood the ignition switch defect in and around 2012 and 2013. These attorneys, including  in-house lawyer Michael Milliken, negotiated settlement agreements with families whose loved  ones had been killed and/or injured while operating a Subject Vehicle under circumstances that  implicated the ignition switch defect. In spite of their knowledge of the ignition switch defect,  New GM's attorneys concealed what they knew and neglected to question whether the Subject Vehicles should be recalled. This quest to keep the ignition switch defect secret prolonged its  ultimate discovery and contributed to added death and injury.

147.    During the FPE inquiry, New GM determined that, although increasing the detent in the ignition switch would reduce the chance that the key would inadvertently move from the  "run" to the "accessory/off" position, it would not be a total solution to the problem.

148.    Indeed, New GM engineers identified several additional ways to actually fix the problem. Unsurprisingly, these solutions echoed solutions that Old GM engineers had proposed years before, but had decided not to implement because of cost concerns. New GM engineers proposed adding a shroud to prevent a driver's knee from contacting the key, modifying the key and lock cylinder to orient the key in an upward facing orientation when in the "run" position, and adding a push button to the lock cylinder to prevent it from slipping out of run. New GM rejected each of these ideas.

149.    The photographs below depict a New GM engineer in the driver's seat of a Cobalt during the investigation of Cobalt stalling incidents. Note the proximity of the driver's knee to the ignition key:



150.    These photographs show the dangerous position of the key in the lock module on the steering column, as well as the key with the slotted head, which allows the key fob to hang too low off the steering column. New GM engineers understood that the key fob can be impacted and pinched between the driver's knee and the steering column, and that this may cause the key to inadvertently turn from the "run" to the "accessory" or "off" position. The photographs show why New GM engineers understood that increasing the detent in the ignition switch would not be a total solution to the

problem, for such a step would not alleviate the possibility of impacting the key with a driver's knee. The photographs also show why New GM engineers believed that additional changes (such as the shroud) were necessary to fully fix the defects with the ignition switch.

151.    On October 4, 2012, there was a meeting of the Red X Team during which Jim Federico gave an update of the Cobalt airbag non-deploy investigation. According to an email from Stouffer on the same date, the "primary discussion was on what it would take to keep the SDM active if the ignition key was turned to the accessory mode." Again, New GM engineers recognized that the SDM should remain active if the key is turned to the "accessory/off" mode, but GM took no action at this time to remedy the ignition switch defect or notify customers that the defect existed.

152.    During the October 4, 2012 meeting, Stouffer and the other members of the Red X Team also discussed "revising the ignition switch to increase the effort to turn the key from Run to Accessory."

153.    On October 4, 2012, Mr. Stouffer emailed Ray DeGiorgio and asked him to "develop a high level proposal on what it would take to create a new switch for service with higher efforts." On October 5, 2012, DeGiorgio responded:

> Brian,
>
> In order to provide you with a HIGH level proposal, I need to understand what my requirements are. what is the TORQUE that you desire? Without this information I cannot develop a proposal.

154.    On October 5, Stouffer responded to DeGiorgio's email, stating:

> Ray,

> As I said in my original statement, I currently don't know what the torque value needs to be. Significant work is required to determine the torque. What is requested is a high level understanding of what it would take to create a new switch.

155.    DeGiorgio replied to Stouffer the following morning:

> Brian, Not knowing what my requirements are I will take a SWAG at the Torque required for a new switch. Here is my level proposal
>
> **Assumption is 100 N cm Torque.**
>
> - New switch design = Engineering Cost Estimate approx. $300,000
> - Lead Time = 18 − 24 months from issuance of GM Purchase Order and supplier selection.
>
> Let me know if you have any additional questions.

156.    Stouffer later admitted in a deposition that DeGiorgio's reference to "SWAG" was an acronym for "Silly Wild-Ass Guess."

157.    DeGiorgio's cavalier attitude exemplifies New GM's approach to the safety-related defects that existed in the ignition switch and airbag system in the Subject Vehicles. Rather than seriously addressing the safety-related defects, DeGiorgio's emails show he understood the ignition switches were contributing to the crashes and fatalities, and he simply could not care less.

158.    It is also obvious from this email exchange that Stouffer, who was a leader of the Red X Team, had no problem with DeGiorgio's cavalier and condescending response to the request that he evaluate the redesign of the ignition switches.

159.    On April 29, 2013, Ray DeGiorgio was deposed in Detroit, Michigan as part of the lawsuit brought by Brooke Melton's parents. At his deposition, Mr. DeGiorgio was shown photographs of the differences between the ignition switch in

Brooke's Cobalt and the ignition switch in the 2008 Cobalt (which DeGiorgio had redesigned without changing the part number).

160.    Mr. DeGiorgio was questioned about his knowledge of any differences in the ignition switches:

> Q.    And I'll ask the same question. You were not aware before today that GM had changed the spring – the spring on the ignition switch had been changed from '05 to the replacement switch?
>
> MR. HOLLADAY: Object to the form. Lack of predicate and foundation. You can answer.
>
> THE WITNESS: I was not aware of a detent plunger switch change. We certainly did not approve a detent plunger design change.
>
> Q.    Well, suppliers aren't supposed to make changes such as this without GM's approval, correct?
>
> A.    That is correct.
>
> Q.    And you are saying that no one at GM, as far as you know, was aware of this before today?
>
> MR. HOLLADAY: Object. Lack of predicate and foundation. You can answer.
>
> THE WITNESS: I am not aware about this change.
>
> (DeGiorgio Depo at 151-152.)

161.    Mr. DeGiorgio's testimony left no doubt that he unequivocally disclaimed any knowledge of any change in the ignition switch in the 2005-2010 Cobalts. Mr. DeGiorgio, however, authorized the redesign to the ignition switches in 2006. Thus, the testimony provided in 2013 was knowingly false and intended to mislead.

162.    Mr. DeGiorgio also provided the following testimony about the ignition switch supplier, Delphi:

Q.    And there weren't any changes made – or were there changes made to the switch between '05 and 2010 that would have affected the torque values to move the key from the various positions in the cylinder?

A.    There was one change made to the resistor in '08, but that should not have affected the torque or the displacement of the switch.

I can restate this way: There was an electrical change made in '08, but not a mechanical change – at least there were no official changes, mechanical changes, made to the switch that I know of.

Q.    When you say no official, could there be unofficial changes made?

A.    I'm not saying that there was, I'm just saying if there was something changed at the supplier side, we were not aware of it and we did not approve it, okay?

(DeGiorgio Depo at 57-58).

163.    Mr. DeGiorgio's testimony left no doubt that he had spoken with Delphi employees and that they confirmed that there were no changes made to the ignition switch in 2005-2010 Cobalts. This testimony, like the testimony set forth above, was knowingly false and intended to mislead.

164.    New GM's years-long internal "investigation" into the Subject Vehicles—as well as all of the Old GM documents that were included in the "Purchased Assets" from the bankruptcy sale—provided New GM with actual knowledge, long before Plaintiff's injury, of the ignition switch defects in the Subject Vehicles. Notwithstanding these facts, New GM continued to fraudulently conceal the nature and extent of the defects from the public, inducing customers, including Plaintiffs, to purchase Subject

Vehicles with no knowledge of the existence of these serious and uniform defects, and no provision to avoid the safety risks of operating the Subject Vehicle. Mr. DeGiorgio's deposition testimony in 2013, while appalling, is simply emblematic of the cover-up that was long-running and company-wide.

165.    Moreover, throughout the entirety of its corporate existence, New GM received numerous and repeated complaints of moving engine stalls and/or power failures in the Subject Vehicles. These complaints are yet more evidence that New GM was fully aware of the ignition switch defect and should have timely announced a recall much sooner than it did.

166.    New GM was aware of these problems year after year and nationwide, as reflected not only by the internal documents reflecting knowledge and cover-up at high levels, but also in thousands of customer complaints recorded in GM's internal complaint logs and documents. GM received and reviewed complaints of safety issues from customers with Subject Vehicles in nearly every state nationwide. Documents produced by GM pursuant to Order No. 12 in *In re General Motors LLC Ignition Switch Litigation* (14-MC-2543, Dkt. No. 46) show that GM was aware of customer complaints of stalling Subject Vehicles in many of these states and ultimately did nothing about them. These complaints, of course, are in addition to the multiple non-deploy fatalities of which New GM became aware and even investigated from July 2009 to the present.

### <u>NEW GM ISSUES A RECALL – TEN YEARS TOO LATE</u>

167.    As pressure from the Melton litigation mounted, New GM executives finally felt compelled to act. On January 31, 2014, New GM's Field Performance Review Committee and Executive Field Action Decision Committee ("EFADC") finally ordered a recall of some Subject Vehicles.

168.    On February 7, 2014, New GM, in a letter from Director of Product Investigations and Safety Regulations Carmen Benavides, informed NHTSA that it was conducting a recall of 2005-2007 model year Chevrolet Cobalt and 2007 model year Pontiac G5 vehicles.

169.    New GM knew that this recall was insufficient in scope. Indeed, New GM knew that the same defective ignition switches installed in the Cobalt and G5 vehicles were installed in Chevrolet HHR, Pontiac Solstice, Saturn Ion, and Saturn Sky vehicles. But New GM did not recall these vehicles on February 7.

170.    On February 19, 2014, a request for timeliness query of New GM's recall was sent to NHTSA by The Cooper Firm. The timeliness query pointed out that New GM had failed to recall all of the vehicles with the defective ignition switches.

171.    The February 19, 2014 timeliness query also asked NHTSA to investigate New GM's failure to fulfill its legal obligation to report the safety defects in the Subject Vehicles within five days of discovering the defect—a requirement of applicable federal law.

172.    On February 24, 2014, New GM informed NHTSA it was expanding the recall to include 2006-2007 model year Chevrolet HHR and Pontiac Solstice, 2003-2007 model year Saturn Ion, and 2007 model year Saturn Sky vehicles.

173.    New GM included an Attachment to the February 24, 2014 letter. In the Attachment, New GM, for the first time, admitted that it authorized a change in the ignition switch in 2006. Specifically, New GM stated:

> On April 26, 2006, the GM design engineer responsible for the Cobalt's ignition switch signed a document approving changes to the ignition switch proposed by the supplier, Delphi Mechatronics. The approved changes included, among other things, the use of a new detent plunger and spring that increased torque force in the ignition switch. This change to the ignition switch was not reflected in a

corresponding change in the part number for the ignition switch. GM believes that the supplier began providing the re-designed ignition switch to GM at some point during the 2007 model year.

174.    Public criticism in the wake of New GM's piecemeal recalls was withering. On March 17, 2014, Mary Barra issued an internal video, which was broadcast to employees. In the video, Ms. Barra acknowledged:

> Scrutiny of the recall has expanded beyond the review by the federal regulators at NHTSA, the National Highway Traffic Safety Administration. As of now, two congressional committees have announced that they will examine the issue. And it's been reported that the Department of Justice is looking into this matter. . . . These are serious developments that shouldn't surprise anyone. After all, something went wrong with our process in this instance and terrible things happened.

175.    The public backlash continued and intensified. On March 28, 2014, New GM again expanded the ignition switch recall to cover all model years of the Chevrolet Cobalt and HHR, the Pontiac G5 and Solstice, and the Saturn Ion and Sky in the United States. This third expansion of the ignition switch recall covered an additional 824,000 vehicles in the United States and raised the number of recalled vehicles to 2,191,146. New GM's stated reason for recalling the later model year Subject Vehicles significantly misrepresented the safety risk posed by those vehicles. New GM stated that it was expanding the recall to the later-model years because those vehicles may have been installed with defective service parts. However, New GM knew by the time of the March 28, 2014 recall expansion that the later-model Subject Vehicles had been factory-installed with an ignition switch that also routinely failed the torque specification.

176.    New GM's recalls of the Subject Vehicles were not only untimely, they are completely insufficient to correct the safety-related defects in the Subject Vehicles.

177.   To address the safety defect, New GM is replacing the defective ignition switches in the Subject Vehicles with a new ignition switch, and providing new keys without slotted key heads. These repairs fail to address the design defect that causes the key fob/chain to hang too low on the steering column, and fails to address the defective airbag system, which disables the airbag immediately when the engine shuts down. Thus, even when the ignition switches and keys are replaced, a defective condition will still exist in the Subject Vehicles and the potential will continue to persist for a driver to contact the key chain and inadvertently turn the key from the "run" to the "accessory/off" position.

178.   New GM notified owners and lessees of the Subject Vehicles by letter beginning in late February of 2014. New GM's recall letter minimizes the risk of the ignition switch defect in many ways. For example, it indicates that ignition problems would occur only "under certain conditions" and emphasizes that the risk increases if the "key ring is carrying added weight . . . or your vehicle experiences rough road conditions"; it conceals the fact that New GM knew that the defect had caused or contributed to multiple deaths and serious injuries; and it mischaracterizes the defect in Plaintiffs' vehicle as relating only to potential service repairs with a defective switch when New GM knew that the vehicles were factory-installed with ignition switches that also failed the minimum torque specification at a high rate.

179.   On May 16, 2014, New GM agreed to a civil penalty of $35 million— the maximum permitted by law—for its failure to timely notify NHTSA of the ignition switch defect. As part of its agreement, New GM agreed to implement numerous internal reforms to improve its response to product defect issues in the future. New GM expressly admitted it violated the Safety Act.

180.    New GM later fired fifteen employees for their participation in the ignition switch cover-up. Two of those employees, Design Release Engineer Ray DeGiorgio and  Gary Altman, were intimately involved in the development—and concealment—of the defective ignition switches, and both were longtime employees of Old GM and New GM.

181.    In the months that followed the initial ignition switch recalls, New GM finally began to acknowledge that it has been ignoring safety concerns in its vehicles for years. To date, New GM has announced over 35 recalls since February 2014, and it has recalled over 26.6 million vehicles in the past eight months. This number is staggering; indeed, no car manufacturer  has ever recalled as many vehicles in a single year.

182.    However, New GM refuses to acknowledge what Old GM's and New GM's engineers have long known—the defect in the ignition switches is not limited to inadequate torque performance, but also includes the low placement of the ignition on the steering cylinder as well as the airbag system that is disabled when the ignition is in the "accessory" or "off" position. New GM's FPE team recognized these essential aspects of the safety defect as recently as 2012 when they proposed placing a shroud over the ignition and/or moving the ignition higher on the steering column.

183.    Even if the ignition switch defect were purely an issue of inadequate torque performance, however, the evidence shows that the ignition switches were defective even after DeGiorgio's 2006 redesign. In May of 2012, New GM's FPE team tested the ignition switches  in dozens of Subject Vehicles, many of them model years 2008 and 2009. In these tests, New  GM engineers found that the ignition switches for these 2008 and 2009 model year Subject Vehicles by and large failed to meet the torque

Case 1:17-cv-10114-JMF    Document 1    Filed 12/27/17    Page 51 of 65

specifications for the ignition switch.

184.    Further, New GM's own investigation into airbag non-deployment events in Chevrolet Cobalt vehicles identified over 250 non-deploy crashes involving 2008-2010 Cobalts. Upon information and belief, New GM has knowledge of numerous non-deploy incidents in Subject Vehicles of model year 2008 and later in which the ignition switch was not replaced prior to the relevant incident. New GM was also aware of instances of power loss in later-model year Subject Vehicles, including in the HHR.

185.    What is more, until New GM recalled 2008 and later model year Subject Vehicles, it had never notified the owners of those vehicles that they should remove all items from their key chains, change out their slotted key for a center-hole key, and/or avoid jarring road conditions or contacting the ignition key with one's knee. New GM knew that any of these scenarios could cause the ignition switches in later model year Subject Vehicles to fail, but it did nothing to notify its customers of these facts.

186.    In truth, the problems in earlier model year Subject Vehicles and later model year Subject Vehicles are the same. The ignitions are placed dangerously low on the steering column, and the torque required to hold the ignition key in place under normal driving conditions is insufficient.

## FACTS SPECIFIC TO EACH PLAINTIFF

187.    On or about June 29, 2017, KAITLYN WHETSTONE was the driver of a 2006 Chevrolet Cobalt (VIN 1G1AM55B267665412), subject to Recall 14V047000, when suddenly and unexpectedly, a truck stopped in the fast lane of the freeway, she was unable to stop and struck the truck from the rear, the airbags failed to deploy, all of which resulted in WHETSTONE suffering serious and permanent injuries, which include but are not limited to

a concussion.  This vehicle is subject to recalls involving the airbags.  One or more of these recall issues was the proximate cause of Plaintiff's injuries and damages.  These are the same issues Old GM and then New GM were well aware of for years and covered up from the public and NHTSA.

## TOLLING OF THE STATUTE OF LIMITATIONS

188.    Old GM sold the Plaintiffs' vehicles at issue in this case years prior to the filing of this action. Any statutes of repose or limitation are tolled, however, because of New GM's fraudulent concealment of the ignition switch defect, and conduct equivalent to that required for a finding of willful and wanton conduct against GM.

189.    Further, Old GM and New GM were under a continuous duty to disclose to Plaintiff the true character, quality, and nature of the Subject Vehicles. Yet, Old GM and New GM actively concealed the true character, quality, and nature of the vehicles (including by, inter alia, secretly settling defect-related cases to prevent disclosure of the defect, deleting the word "stall" from the TSB to avoid NHTSA scrutiny, secretly changing the ignition switch in an attempt to increase the torque required to rotate the switch, and secretly considering multiple solutions to the known safety defect, only to repeatedly reject such fixes due to cost concerns), preventing Plaintiff from discovering the true facts regarding the cause of his injuries. Based on the foregoing, New GM is estopped from relying on any statutes of limitations in defense of this action.

190.    Further, Plaintiffs had no realistic ability to discern that their "vehicles" were defective until—at the earliest—the ignition switch defect caused a sudden unintended power failure. Even then, Plaintiffs had no reason to know the sudden loss of power was caused by a defect in the ignition switch until his vehicle was recalled in March

2014 because of Old GM's and New GM's active concealment of the ignition switch defect. And even after New GM finally notified Plaintiff, NHTSA, and the public about the ignition switch defect, it misrepresented the risk of harm posed to Plaintiffs.

**CLAIMS FOR RELIEF**
**FIRST CLAIM FOR RELIEF**

**Negligence, Gross Negligence and Recklessness**

191.    Plaintiffs adopt and incorporate by reference all prior paragraphs of the Complaint as if set out here in full.

192.    This claim is brought under New York law.

193.    Under the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement, New GM expressly assumed liability for post-sale accidents involving Old GM vehicles causing personal injury, loss of life, or property damages. New GM also acquired knowledge of Old GM's activities and the defective ignition switch via the mind of the employees, officers, managers, books and records obtained and/or acquired as a result of the  June 26, 2009 Amended and Restated Master Sale and Purchase Agreement and subsequent Sale Order. Thus, the acts or omissions of Old GM are part of the foundation for the liability assumed by New GM. Further, Plaintiff has claims for a post-sale accident involving a New GM vehicle that caused personal injury or property damage and New GM is therefore expressly liable to Plaintiff for Old GM's negligence. New GM is also liable to Plaintiff for its independent, post- Sale negligence.

194.    Old GM was negligent in designing, manufacturing, and providing warnings for the Plaintiffs' vehicles, as set forth in the paragraphs above. Old GM acted unreasonably in manufacturing and selling vehicles with design, manufacturing, and informational defects and concealing such defects from Plaintiff, the public, and NHTSA.

195.    In addition, Old GM's failure to notify NHTSA and Old GM vehicle owners of safety-related defects as required by 49 U.S.C. §30101, et seq. and 49 C.F.R. §§573, 577 constituted negligence per se. These statutes and regulations were enacted for the protection and safety of the public.

196.    Old GM had a duty to ensure that its vehicles were reasonably safe to operate and did not contain defective components, and to produce vehicles with appropriate warning instructions. When Old GM learned that the Plaintiffs' vehicle was defective, it had a continuing duty to warn Plaintiff of the existence of the defect, including after the original sale of the vehicle.

197.    New GM was also negligent in providing warnings about Plaintiffs' vehicles and unreasonably concealing the design, manufacturing, and informational defects that  New GM knew existed in Old GM vehicles. New GM had a continuing duty to monitor Old GM vehicles for safety-related defects and warn Plaintiff, the public, and NHTSA about safety- related defects in Old GM vehicles.   This duty is based on the direct and continuing   relationship between New GM and the owners of Old GM vehicles. Among other things, New GM had a statutory duty to warn owners of Old GM vehicles, including Plaintiff, of safety defects and did, in fact, warn owners of Old GM vehicles, including Plaintiff, of the safety defects (though the warning arrived years later than it should have and unreasonably minimized the risk of harm.

198.    In addition, New GM's failure to notify NHTSA and Subject Vehicle owners of safety-related defects as required by 49 U.S.C. §30101, et seq. and 49 C.F.R. §§573, 577 constituted negligence per se. These statutes and regulations were enacted for the protection and safety of the public.

199.    Thus, independent of any failures by Old GM and New GM as described

herein, New GM breached its duties to Plaintiff by failing to provide appropriate notice of and repair procedures for the ignition switch defect in Plaintiff's vehicle. In doing so, New GM departed from the reasonable standard of care required of it.

200.    Old GM's and New GM's negligence proximately caused the injuries and damages sustained by Plaintiffs, as set forth herein. New GM's negligence in manufacturing and selling a vehicle containing design and manufacturing defects and Old GM's and New GM's negligence in failing to adequately warn Plaintiffs about known defects in their vehicles and in violating the statutes and regulations that required Old GM and New GM to recall Plaintiffs' vehicles for safety-related defects proximately caused Plaintiffs' inability to avoid the crash made the basis of this lawsuit that left them severely injured or killed.

201.    New GM is liable for compensatory damages based on Old GM's conduct and for compensatory and punitive damages based on New GM's own independent conduct.  New GM is further liable for fair and reasonable damages for pain and suffering, medical expenses, and/or damages as may be determined by the Court or the jury, as well as costs, expenses, and reasonable attorneys' fees.

## SECOND CLAIM FOR RELIEF
### Strict Liability

202.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

203.    This Claim is brought under New York law.

204.    Under the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement, New GM expressly assumed liability for post-sale accidents involving Old GM vehicles causing personal injury, loss of life, or property damages. Plaintiff has claims for

a post-sale accident involving an Old GM vehicle that caused personal injury or property damage and New GM is therefore expressly liable to Plaintiff for Old GM's conduct under New York's laws of strict products liability.

205.    New GM manufactured Plaintiffs' vehicles.

206.    Plaintiffs' vehicles were defective and unreasonably dangerous because the harmful characteristics or consequences of its design outweigh the benefits of its design. In light of the allegations contained herein, it was unreasonable for New GM to put Plaintiffs' vehicles on the market without changing the design. In addition, Plaintiffs' vehicles failed to perform as safely as a ordinary consumer would expect when the product is used in a reasonably foreseeable manner.

207.    Plaintiffs' vehicle was also defective and unreasonably dangerous because of a manufacturing defect. Plaintiffs' vehicle contained a condition which New GM did not intend and, as a result, it failed to perform as safely as an ordinary consumer would expect when the product is used in a reasonably foreseeable manner.

208.    Plaintiffs' vehicle was also defective and unreasonable dangerous because it did not have an adequate warning. Plaintiff would have heeded an adequate warning. Had a proper warning been given, Plaintiff's injury would not have occurred.

209.    Old GM had a legal duty to design, inspect, test, manufacture, and assemble the Plaintiffs' vehicles so that it would be reasonably crashworthy and provide a reasonable degree of occupant safety in foreseeable collisions occurring in the highway environment of its expected use. Old GM also had a duty to warn of the foreseeable risks of harm from using the Plaintiffs' vehicles.

210.    Among other things, Plaintiffs' vehicles are not crashworthy, are defective, and are unreasonably dangerous and unsafe for foreseeable users and occupants in each of the following particulars:

a.    it has an ignition switch that rotates too easily out of the "run" position, causing the HHR to stall or lose engine power, power steering, and/or power braking while in normal and foreseeable operation;

b.    it has an ignition that is placed in a position so that it is common and foreseeable for a driver to impact the ignition with his or her knee, thereby moving the ignition switch from the "run" to the "accessory" or "off" position;

c.    it has a slotted ignition key that makes inadvertent ignition switch rotation even more likely;

d.    it has an ignition switch that is a single point of failure, disabling critical safety functions, including power brakes, power steering, and front airbags when the ignition is in the "accessory" or "off" position; and

e.    Old GM did not provide an adequate warning regarding the above.

211.    The defective nature of the Plaintiffs' vehicles was the proximate cause of Plaintiff's damages, as set forth herein, thus rendering New GM strictly liable for compensatory damages, as well as for other non-punitive damages such as costs, expenses, and reasonable attorneys' fees, based on Old GM's conduct.

**THIRD CLAIM FOR RELIEF**
**Fraudulent Concealment**

212.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

213.    This Claim is brought under New York law.

214.    As set forth above, Defendant concealed and/or suppressed material facts concerning the safety of their vehicles from Plaintiff, the public in general, the NHTSA and continues to do so today.  New GM knew that the Subject Vehicles, including the Plaintiffs' vehicles, were designed and manufactured with ignition switch defects.  For example, New GM knew (through knowledge acquired from Old GM employees and

documents and its own independent conduct), inter alia, that: the Subject Vehicles were prone to inadvertent ignition switch rotation, which would cause dangerous moving stalls and disable critical safety systems – increasing the risk of a crash and serious injury or death; the problem of inadvertent ignition switch rotation was not limited to low torque; Catera-spring switches secretly installed in later model-year Subject Vehicles still failed the minimum torque specification; slotted keys like the one Plaintiffs received with their vehicles made the Subject Vehicles even more prone to inadvertent ignition switch rotation; and numerous people had been seriously injured and killed as a result of inadvertent ignition switch rotation in the Subject Vehicles. Yet New GM intentionally, deliberately, and actively concealed this material information from consumers in the United States by, for example, secretly settling defect-related litigation to avoid disclosure of the defect and secretly considering multiple solutions to the defect only to reject them due to cost concerns. New GM vehicle owners like Plaintiff had no knowledge of these safety-related defects..

215.    New GM had a duty to disclose the material facts to Plaintiff, the public who owned defective Old GM vehicles, and NHTSA, but failed to do so. New GM had a duty to disclose the facts to Plaintiff because: (1) New GM knew that Plaintiff was ignorant of the material facts that Old GM and New GM intentionally concealed; (2) Plaintiff did not have an equal opportunity to discover the material facts that New GM intentionally concealed; and (3) New GM had notification and recall obligations under the Safety Act with respect to the subject vehicles, including a continuing duty to monitor and notify owners of the Subject vehicles of defects.

216.    New GM knew that Plaintiffs had no knowledge of the concealed facts, and that he did not have an equal opportunity to discover the concealed facts. New GM was in

a position of superiority over Plaintiffs. Indeed, Plaintiffs trusted New GM not to allow defective vehicles for which it was responsible to remain in the marketplace. Plaintiffs further trusted New GM to warn of defects and to recall defective vehicles.

217.    By deliberately concealing these material facts, New GM intended to hide information regarding the defect, mislead, avoid suspicion, or prevent further inquiry into the matter by NHTSA, Plaintiffs, and the public in general. New GM further intended to induce NHTSA not to recall Plaintiffs' vehicles, as well as other Subject Vehicles, in order to reduce its eventual financial exposure.

218.    Plaintiffs reasonably and justifiably relied on New GM's nondisclosure, and reasonably but unknowingly continued to use their vehicles until the date of the accident. Plaintiffs relied on New GM's omission and was deceived by New GM's omission into believing that their  vehicle was safe.

219.    Plaintiffs would not have purchased their vehicle had they known of the ignition switch defect.  New GM reaped the benefit of the sales and leases from the Subject Vehicles because it did not disclose the defects to the public and to NHTSA. Additionally, in not disclosing the Subject Vehicles' defects, New GM prevented any meaningful investigation of numerous accidents that were likely the result of those defects. Further, because New GM had not placed this matter before NHTSA or the public, cars and components in those other similar accidents were disposed of without the appropriate and adequate investigation.

220.    As a direct and proximate result of New GM's wrongful conduct and fraudulent concealment, Plaintiffs suffered damages described herein.

221.   New GM's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiff, such that punitive damages are appropriate.

### THIRD CLAIM FOR RELIEF
### Fraud by Non-Disclosure

222.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

223.   As early as 2001, during pre-production development of the Saturn Ion, Old GM became aware of issues relating to the ignition switch "passlock" system.  The 2001 report stated that the problem included a "low detent plunger force" in the ignition switch.

224.   In 2003, before the launch of the 2005 Cobalt, Old GM became aware of incidents wherein the vehicle engine would suddenly lose power in the event the key moved out of the "run" position when the driver inadvertently contacted the key or steering column.  An investigation was opened and, after consideration of lead-time required and the cost and effectiveness of potential solutions, the investigation was closed with no action taken.

225.   As set forth above, from July 2009 to the present, New GM intentionally concealed or failed to disclose material facts from the Plaintiff, the public and NHTSA.

226.   Additionally, from its inception in 2009, New GM possessed independent knowledge of the defects in the Plaintiffs' vehicles and the need to undertake multiple design steps to resolve those defects to prevent injury and economic harm to vehicle owners such as Plaintiffs.  This knowledge was based, in part, on the information from records, files, reports and other documents and materials regarding the defective ignition

switch maintained by Old GM, all of which were included in the assets purchased by New GM during the bankruptcy sale.

227.    New GM had a duty to disclose the facts to the Plaintiffs and New GM knew: (1) that the Plaintiffs were ignorant of the material facts that New GM did not disclose and/or intentionally concealed; and (2) the Plaintiffs did not have an equal opportunity to discover the material facts that New GM did not disclose and/or intentionally concealed.  Old GM's fraud, fraudulent concealment and fraudulent non-disclosure were all components of the subject incidents of the Plaintiffs.  Because New GM acquired knowledge of Old GM's activities and the defective ignition switch as well as other defects via the minds of the employees, officers, managers, books and records obtained and/or acquired as a result of the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement and subsequent Sale Order, New GM is expressly liable to Plaintiffs. Further, the duties of Old GM are part of the foundation for the liability acquired by New GM.

228.    Independent of any failures by New GM as described herein, between July 10, 2009 and March, 2014, New GM breached its duties to the Plaintiffs by failing to disclose knowledge of the defective ignition switch to Plaintiffs.

229.    New GM had a duty to disclose the facts to the Plaintiffs and New GM knew: (1) that the Plaintiffs were ignorant of the material facts that New GM did not disclose and/or intentionally concealed; and (2) the Plaintiffs did not have an equal opportunity to discover the material facts that New GM did not disclose and/or intentionally concealed.

230.    By failing to disclose these material facts, New GM intended to induce the Plaintiffs to take some action or refrain from acting.

231.    The Plaintiff relied on New GM's non-disclosure and they were killed or injured as a result of acting without knowledge of the undisclosed facts.

## DAMAGES – PERSONAL INJURY CLAIMS

232.    As a direct and proximate result of New GM's wrongful conduct, Plaintiffs have been (and continues to be) damaged in the form of: (a) past and future pain and suffering; (b) past and future physical impairment; (c) past and future physical disfigurement; (d) past and future mental anguish; (e) past and future loss of consortium and/or loss of services; (f) past and future loss of income and/or lost earning capacity; (g) past and future reasonable and necessary medical expenses; and (h) past and future loss of enjoyment of life' (i) loss of function; (j) prospective medical care and medication costs; and (k) property damage to his vehicle sustained in the crash.  All of the damages sustained by Plaintiffs were reasonably foreseeable by New GM, and exceed the minimum jurisdictional limits of this Court.  All conditions precedent to Plaintiffs' claims for relief have been performed and/or occurred.

## EXEMPLARY/PUNITIVE DAMAGES

233.    Plaintiffs are also entitled to exemplary and punitive damages.

234.    The evidence referenced in this Complaint and the mounting evidence regarding the recent recalls of millions of defective GM vehicles makes it clear that New GM is guilty of exceptional misconduct. New GM was issued, and agreed to, a record fine by the U.S. Department of Transportation's National Highway Traffic Safety Administration. New GM has been aware for more than a dozen years that the ignition switches in the Subject Vehicles were grossly inadequate and subjected the driving public to a grave risk of grievous harm. Producing and marketing vehicles that are subject to complete system failures at highway speeds is akin to launching millions of torpedoes

onto American streets and highways – with unsuspecting consumers inside. New GM knew about the problem for years and, because of greed and/or gross ineptitude, refused to act on the problem. Instead, New GM gave the issue the "GM nod." The "GM nod" demonstrates that more than one of New GM's superior officers in the course of employment ordered, ratified, and/or participated in the malicious conduct. These officers acted maliciously, wantonly, and/or recklessly, and clearly New GM is guilty of exceptional misconduct and gross negligence. Plaintiff demands punitive damages for this conduct.

235.    Plaintiffs would further show that the clear and convincing evidence in this case will show that New GM consciously or deliberately engaged in oppression, fraud, wantonness, and/or malice in concealing the defect in the Subject Vehicles and failing to recall the vehicle in a timely manner.  New GM had actual, subjective awareness of the risk involved but nevertheless proceeded with indifference to the rights, safety, or welfare of others, including Plaintiffs.  Therefore, punitive damages are sought and should be assessed against New GM.  Plaintiffs do not in this Action seek punitive damages for the conduct of Old GM, but does not concede that New GM did not also assume liability for punitive damages.

## Pre-Judgment Interest and Post-Judgment Interest

236.    Lastly, Plaintiffs are entitled to pre-judgment and post-judgment interest (to be determined).

## JURY DEMAND

237.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in

Plaintiffs' favor and against Defendant as follows:

A.     an award to Plaintiffs for actual damages, compensatory and
       exemplary damages, including interest, in an amount to be proven at
       trial;

B.     an award of costs, as allowed by law;

C.     an award of pre-judgment and post-judgment interest, as provided
       by law;

D.     leave to amend this Complaint to conform to the evidence produced
       at trial; and

E.     such other relief as may be appropriate under the circumstances.

Dated: December 27, 2017

RESPECTFULLY SUBMITTED,

*/s/ Mitchell A. Toups*
Mitchell A. Toups (TX Bar # 20151600)
WELLER, GREEN, TOUPS & TERRELL, LLP
2615 Calder Ave., Suite 400
Beaumont, TX 77702
Telephone: (409) 838-0101
Facsimile: (409) 832-8577
Email: matoups@wgttlaw.com

James R. Dugan, II
David Scalia
Lanson Bordelon
THE DUGAN LAW FIRM, APLC
365 Canal Street, Suite 1000
New Orleans, Louisiana 70130
Telephone: (504) 648-0180
Facsimile: (504) 648-0181

Gregory K. Evans (TX Bar  No. 24002065)
Law Offices of Gregory K. Evans, PLLC
3900 Essex, Suite 690
Houston, TX  77027
(713) 840-1299
Facsimile:  (281) 254-7886
Email:  greg@gevanslaw.com

***Attorneys for Plaintiffs***